UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Gerry W., | Case No. 23-cv-2010 (ECW) |
|     Plaintiff, | |
| v. | **ORDER** |
| Martin J. O'Malley, Commissioner of Social Security Administration, | |
|     Defendant. | |

---

This matter is before the Court on Plaintiff Gerry W.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 16); and Defendant Commissioner of Social Security Administration, Martin J. O'Malley's ("the Commissioner") brief in opposition (Dkt. 19).[1]

## I.    PROCEDURAL BACKGROUND

On April 15, 2021, Plaintiff filed an application for Title II Disability Insurance benefits alleging disability as of March 1, 2020, due to prostate cancer, a knee problem, and a back problem. (R. 188-92, 231.)[2] Plaintiff's application was denied initially and on reconsideration. (R. 70-83.) Plaintiff filed a written request for a hearing before an

---

[1] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

[2] The Social Security Administrative Record ("R.") is available at Docket 9.

administrative law judge and a hearing occurred on June 8, 2022, before Administrative Law Judge Sarah R. Smisek ("the ALJ"). (R. 53-69.)

In a decision dated June 22, 2022, the ALJ concluded that Plaintiff was not disabled. (R. 8-27.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a)(4),[3] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since January 1, 2020 and that he met the insured status requirements of the Social Security Act through December 31, 2024. (R. 14.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: status post prostate cancer status post radiation therapy, degenerative joint disease of the knees, and umbilical hernia. (R. 14.)

---

[3] The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (citations omitted).

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 15-16.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform medium work as defined in 20 CFR 404.1567(c) except: lifting and carrying 50 pounds occasionally and 25 pounds frequently; sitting for 6 hours and standing and/or walking for 6 hours out of an 8-hour workday; occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps or stairs; frequent balancing, stooping, kneeling, crouching, and crawling; no exposure to concentrated levels of wetness or vibration; no exposure to workplace hazards, such as unprotected heights and dangerous machinery.

(R. 16.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that given Plaintiff's age, education, work experience, and RFC, that there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform, including work as:  Sealing Machine Operator (DOT No. 920.685-074) and Hand Packager (DOT No. 920.587-018).  (R. 22.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 22.)

Plaintiff filed a request for review of this decision, and the Appeals Council denied further review on May 11, 2023, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-5.)

Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented by the parties.

## II. RELEVANT RECORD

Plaintiff represented that he worked as a laborer until November 2019. (R. 221.) Plaintiff quit his work due to being unable to physically do the work, as the result of being on his feet, his blisters, and exhaustion. (R. 60-61.)

On November 21 and 29, 2019, Plaintiff reported no urinary urgency or frequency. (R. 362, 368.)

On or about January 27, 2020, Plaintiff was notified of his diagnoses of prostate cancer. (R. 347-50.) He was negative for incontinence or frequent urination. (R. 347.) Plaintiff decided to proceed with radiation therapy. (R. 349.)

On March 5, 2020, Plaintiff reported he was "overall satisfied" and happy with his urination. (R. 341, 344.)

On April 21, 2020, Plaintiff was notified that while he did have prostate cancer proven by biopsy, it fortunately was not large enough to be visible on an MRI scan. (R. 338.)

On or about May 27, 2020, Plaintiff began radiotherapy for his prostate cancer. (R. 329.) Plaintiff completed his course of radiation therapy on June 5, 2020. (R. 329, 321, 327.)

4

On June 3 and 9, 2020, it was noted that Plaintiff was tolerating radiation therapy related to his prostate cancer, with a slight increase in urinary frequency and urgency. (R. 327, 328.) He was advised that urinary symptoms could progress over the next week or two post-radiotherapy. (R. 327.)

On July 23 2020, Plaintiff was seen for a follow-up for his prostate cancer. (R. 325.) Plaintiff was "overall satisfied with his urination with mild urinary urgency." (R. 325.)

On January 7, 2021, Plaintiff was seen for a follow-up for his prostate cancer. (R. 321.) From a urinary standpoint, Plaintiff denied dysuria[4] or hematuria.[5] (R. 321.) It was noted that: "He does have urinary urgency, which does pre date his course of radiotherapy. He feels that this may be slightly exacerbated post radiotherapy, but does continue to improve with time." (R. 321.)

On February 12, 2021, Plaintiff was seen for a radiation oncology progress appointment. (R. 319.) Plaintiff claimed frequent urination, but noted a gradual improvement. (R. 319.)

---

[4]  "Dysuria is the sensation of pain and/or burning, stinging, or itching of the urethra or urethral meatus associated with urination. It is a prevalent urinary symptom experienced by most people at least once in their lifetime. Dysuria typically occurs when urine comes in contact with the inflamed or irritated urethral mucosal lining." https://www.ncbi.nlm.nih.gov/books/NBK549918/#:~:text=Dysuria%20is%20the%20 20sensation%20of,least%20once%20in%20their%20lifetime (last visited July 2, 2024).

[5]  "Hematuria means there is blood in your urine." https://www.niddk.nih.gov/ health-information/urologic-diseases/hematuria-blood-urine is (last visited July 2, 2024).

On March 9, 2021, Plaintiff was seen for urinary symptoms over the previous week. (R. 316.) Plaintiff noted urinary frequency, urgency and terminal dysuria, some hematuria, and did not feel as though he was emptying his bladder completely. (R. 316.) Plaintiff was treated with the antibiotic Cipro. (R. 316, 318.)

On April 14, 2021, Plaintiff was seen for a progress appointment. (R. 314.) Plaintiff reported severe urinary symptoms improved with antibiotic therapy, but he continued to complain primarily of urinary frequency with some terminal dysuria. (R. 314.) According to Plaintiff's doctor, "He reports ongoing urinary urgency, frequency which in part predates his course of radiotherapy, but exacerbated after and new terminal dysuria, partially improved with recent antibiotic therapy. I offered repeat urinalysis, however patient declined." (R. 315.)

In an August 19, 2021 radiation oncology report, it was noted that Plaintiff had been evaluated in family medicine in March 2021 secondary to urinary frequency, urgency, and terminal dysuria. (R. 311.) He was treated based on symptoms, with Cipro 250 mg twice daily for 5 days. (R. 311.) Plaintiff reported continued significant urinary symptoms, but claimed that there was some improvement recently, primarily in decreased frequency/interval between voids. (R. 311.) He felt that he incompletely empties the bladder and experienced significant urgency. (R. 311.) With respect to his "significant" urination symptoms, Plaintiff's doctor suggested the use of Flomax,[6] and recommended an evaluation in urology, which Plaintiff declined. (R. 312.)

---

[6]   Flomax (Tamsulosin) is a drug used to treat urinary problems caused by an enlarged prostate by relaxing the muscles of the prostate and bladder, which helps the

6

On October 12, 2021, Plaintiff complained of urinary concerns, and stated that he continued "to suffer from increased urinary frequency and urgency" and "that he urinates approximately once every 60-90 minutes." (R. 449.) With respect to urinary symptoms the following was provided:

> Patient notes that he does have a chronic history of urinary urgency and frequency. Reports that he does have intermittent episodes of dysuria. As such, recommended urinalysis further evaluation. Patient declines UA as he reports that he has had this completed the past on 3/9/2021. Urinalysis was negative for nitrite and leukocyte esterase and urine culture grew mixed flora. Patient was prescribed ciprofloxacin 250 mg twice daily for 5 days. Patient notes that symptoms may have improved slightly with antibiotics but continues to persist. Chart review indicates that he did discuss this with radiation oncology during their appointment on 8/19/2021. Patient notes that he is interested [in] initiation of Flomax. Will initiate patient on Flomax 0.4 mg daily. Discussed side effect profile associated with Flomax and encouraged to discontinue if he experiences symptoms.

(R. 452.) Plaintiff was prescribed with Flomax. (R. 459.)

On October 26, 2021, Plaintiff reported no urinary complaints. (R. 448.)

On December 24, 2021, state agency doctor Sai Nimmagadda, MD found on reconsideration that the medical record for Plaintiff showed "Some residual urinary issues but no major complications." (R. 78.)

On January 31, 2022, the last medical note in the record, Plaintiff was seen for his annual examination. (R. 466.) Plaintiff reported urgency and frequent urination. (R. 466.) Plaintiff was not taking his Flomax. (R. 466.) No reason was provided for discontinuing Flomax in the medical record. (R. 466.)

---

flow of urine. *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/Flomax (last visited July 2, 2024).

On November 24, 2021 and February 14, 2022, Plaintiff reported taking Flomax to the SSA, and reported the side effect of sleepiness. (R. 265, 271.)

At the hearing before the ALJ, Plaintiff testified that he was constantly needing to go the bathroom as a result of his radiation treatment. (R. 61.) He also claimed that his urinary frequency was "anywhere from an hour and a half to two hours, at the most." (R. 62.) Thereafter, Plaintiff's lawyer at the hearing before the ALJ clarified as follows:

> Q.   Right, so every hour to an hour and half, you have to urinate.
>
> A    That's correct. I just don't have the capacity. I can't hold it.

(R. 63.)

When the VE was asked if any of the jobs provided as result of ALJ's hypothetical could accommodate the need to take a break every hour and a half throughout the eight-hour day, the VE testified that the hypothetical individual would not be able to perform the listed jobs. (R. 67-68.)

### III.   LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of

8

> "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (marks and citation omitted). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV. DISCUSSION

Plaintiff argues that the ALJ's RFC improperly discounted his urinary urgency and frequency by relying on the fact that Plaintiff was not taking his prescribed medication Flomax, and by mischaracterizing the record by finding that his urinary urgency and frequency predates the onset date of his disability during which he was able to engage in full-time work. (Dkt. 17 at 8.) Plaintiff contends that the ALJ's adverse inference was in error because she did not consider possible reasons he did not comply with treatment by taking Flomax or seek treatment consistent with Social Security Rule 16-3p, and instead relied on one medical note in January 2022. (*Id.* at 8-9.) Plaintiff points to his reports to

9

the Social Security Administration that Flomax made him sleepy and therefore, the ALJ's discounting Plaintiff's urinary problems because of one treatment note stating he was not using Flomax is not supported by substantial evidence. (*Id* at 10.) In addition, Plaintiff takes issue with the ALJ's assertion that his urination condition predated his alleged onset date and that he worked with this condition, on the basis that there is nothing in the record about Plaintiff's urinary frequency while working, and the fact that his urination problems worsened after his prostate cancer and treatment. (*Id.* at 10-11.)

The Commissioner counters that the ALJ reasonably found that the RFC limitations for time off-task or additional breaks due to alleged urinary urgency were not warranted, as Plaintiff failed to meet his burden to establish such a limitation, noting that there was only one medical record where Plaintiff specifically reported urinating every 60-90 minutes and his own testimony that he needed to go to the bathroom anywhere from an hour and a half to two hours, at the most. (Dkt. 19 at 7-8, 10.) The Commissioner also argues that the ALJ was not "playing doctor" with respect to the failure of Plaintiff to take his Flomax, as the last medical appointment in the record noted he was not taking the medication and there was nothing in the record to corroborate any claimed side effect. (*Id* at 8-9.) The Commissioner also argues that while the VE testified that there would be no jobs available for an individual who had to take a break every hour and a half throughout an eight-hour workday, the VE did not address bathroom breaks, which the Commissioner contends "would likely be of shorter duration than a 'break' as typically defined. (*Id.* at 10.) The Commissioner also contends that

10

there is no support for Plaintiff's claimed need to use the bathroom every 60 to 90 minutes outside of one medical record. (*Id.* at 11.)

"A disability claimant has the burden to establish [his] RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Courts have found reversible error where an ALJ "fails to account for any bathroom breaks [a claimant] would need" during the workday as part of an RFC. *See, e.g.*, *Jacob D. v. Kijakazi*, No. 20-CV-0554, 2021 WL 3674610, at *3 (N.D. Ill. Aug. 19, 2021) (collecting cases). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Eichelberger*, 390 F.3d at 591. (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20) (citations omitted). That said, an ALJ may not simply draw his own inferences about a claimant's functional ability

11

from medical reports. *See Koch v. Kijakazi,* 4 F.4th 656, 667 (8th Cir. 2021) (citation omitted).

As stated previously, the ALJ set forth the following RFC for Plaintiff:

[T]o perform medium work as defined in 20 CFR 404.1567(c) except: lifting and carrying 50 pounds occasionally and 25 pounds frequently; sitting for 6 hours and standing and/or walking for 6 hours out of an 8-hour workday; occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps or stairs; frequent balancing, stooping, kneeling, crouching, and crawling; no exposure to concentrated levels of wetness or vibration; no exposure to workplace hazards, such as unprotected heights and dangerous machinery.

(R. 16.)

With respect to Plaintiff's claims of urinary urgency the ALJ found as follows:

The claimant testified to successful treatment for prostate cancer but has ongoing urinary urgency about every one to one and a half hours, which he believes is work preclusive. (See Id.).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

As of early 2022, his PSA had improved to 0.5 from 5.0 in November 2019. While he did has [sic] complained of urinary urgency, which predates the AOD, he has not complied with prescribed medication (Flomax) for this.

* * *

While the claimant did have ongoing complaints of urinary urgency and spikes in his PSA level in early 2021, the latter showed significant improvement by August 2021 when [he] had a PSA of 1.9 and declined urological evaluation prior to being prescribed Flomax for urinary urgency. (See Exhibit 1F/4-5, 8, 13, 14- 15). In October 2021, the claimant was

> amenable to starting Flomax for urinary urgency. (See Exhibit 2F/11). As of January 2022, the claimant continued to complain of urinary urgency and frequent urination but was not taking his prescribed Flomax.
>
> * * *
>
> Notably, the undersigned has not made any allowance for additional breaks and/or time off task in the residual functional capacity for the claimant's urinary urgency. Establishing off task limitations are the claimant's burden and that burden has not been met here. As discussed above, despite complaints of urinary urgency, the claimant was noted as not taking prescribed Flomax in April 2022. (See Exhibit 4F/3). In addition, this impairment predates his AOD and he was able to engage in fulltime work with these symptoms without complaints.

(R. 17-19.)

As set forth above, an ALJ must determine a Plaintiff's RFC based on all of the relevant evidence, including his own description of his limitations. *See Myers*, 721 F.3d at 527 (citation omitted). An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

The Court first considers Plaintiff's argument that the ALJ improperly discounted his urinary urgency and frequency and by mischaracterizing the record. (Dkt. 17 at 8.)

13

Contrary to the ALJ's finding, there is no evidence in the record establishing that Plaintiff's urinary urgency started while he was working or prior to March 1, 2020, the date of his claimed onset of disability. The ALJ did not cite any portion of the record to support her assertion that this condition predated the alleged onset date. Based on the record, Plaintiff quit his work in November 2019 due to physical symptoms. (R. 60-61, 221.) Further, the available medical record includes the following representations from Plaintiff to medical providers that he did not suffer from urinary urgency: on November 21 and 29, 2019; on January 27, 2020, when he was notified of his cancer diagnosis; and on March 5, 2020, when he claimed he was happy and overall satisfied with his urination. (R. 341, 344, 347, 362, 368.) It was only after his radiation therapy that Plaintiff began reporting issues with his urination, beginning in early June through July 23, 2020. (*See, e.g.*, R. 325, 327-28.) The Commissioner argues that Plaintiff admitted "that his urinary urgency/frequency 'in part predated his course of radiotherapy'" based on an April 14, 2021 medical record. (Dkt. 18 at 11 (citing R. 315) (cleaned up).) The April 14, 2021 medical record states: "[Plaintiff] reports ongoing urinary urgency, frequency which in part predates his course of radiotherapy, but exacerbated after and new a **terminal** dysuria, partially improved with recent antibiotic **therapy**." (R. 315.) However, there is no evidence in the record that Plaintiff experienced urinary urgency or frequency issues while he was working through November 2019 or any time prior to March 1, 2020.

      Further, there is no dispute that Plaintiff's urinary urgency was exacerbated by the radiotherapy, as is borne out by the medical records from February 2021 through October 21, 2021—including the April 14, 2021 record relied on by the Commissioner. (*See, e.g.*,

14

R. 311-12, 314-15, 316-18, 319, 449, 452.) In fact, doctors notified Plaintiff that the radiotherapy for his prostate cancer could lead to urinary urgency. (R. 327.) The medical record supports the exacerbation of Plaintiff's urinary urgency—including the statement to medical providers that he needed to urinate every 60 to 90 minutes, and seeking medical relief regarding the same, on October 12, 2021. (R. 449, 452.) It was only after Plaintiff started taking Flomax, beginning in October 2021, that Plaintiff reported no urinary complaints. (R. 459, 448.) Indeed, the Commissioner appears to concede that the ALJ misread the record with respect to whether Plaintiff experienced urinary urgency or frequency concerns before the alleged onset date, noting that "the ALJ's apparent misreading that this symptom existed prior to his alleged onset date." (Dkt. 19 at 10.)

In sum, the Court finds that substantial evidence in the record does not support the ALJ's assertion that Plaintiff suffered from urinary urgency, or the same level of urgency, prior to ending his employment or prior to his claimed onset of disability. The Court makes no finding as to when the urinary urgency rose to the level where additional restrictions, if any, would have become necessary during the relevant period and remands to the ALJ to make such a finding.

The only other support provided by the ALJ for discounting Plaintiff's claims of urinary urgency is his failure to continue taking Flomax, which appeared to provide him with relief. (R. 19). A failure to follow a recommended course of treatment weighs against a claimant's subjective complaints. *See Fatuma A. v. Saul*, No. 19-CV-3160 (WMW/LIB), 2021 WL 616522, at *7 (D. Minn. Jan. 26, 2021), *R. & R. adopted*, 2021 WL 615414 (D. Minn. Feb. 17, 2021) (citing *Wagner v. Astrue*, 499 F.3d 842, 851 (8th

15

Cir. 2007)). However, an ALJ is required to consider reasons why a claimant failed to comply with treatment and provide an explanation of how they considered those reasons in their determination. *See Mashona M. v. Kijakazi*, No. 21-CV-00633 (HB), 2022 WL 2220918, at *12 (D. Minn. June 21, 2022). Indeed, Social Security Ruling ("SSR")16-3p provides:

> We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis of non-compliance with treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints . . . We will explain how we considered the individual's reasons.

SSR 16-3p, 2017 WL 5180304, at *9-10 (S.S.A. Oct. 25, 2017).

Here, Plaintiff twice represented to the SSA that Flomax caused him sleepiness. (R. 265, 271). The ALJ did not follow SSR 16-3p because she never addressed Plaintiff's assertion of sleepiness with Flomax. *See* 20 C.F.R. § 402.35(b)(1) (rulings are binding on ALJs). On remand, the ALJ must consider Plaintiff's noncompliance with Flomax treatment in a manner consistent with SSR 16-3p in light of Plaintiff's claims that the medication made him sleepy.

The Commissioner argues that the ALJ did not base the disability finding solely on Plaintiff's failure to take Flomax, nor on the ALJ's apparent misreading that this symptom existed prior to his alleged onset date. (Dkt. 19 at 8-10.) While the Court agrees that the ALJ considered the evidence with respect to Plaintiff's urinary problems (R. 17-19), the ALJ acknowledged the urinary frequency problems but decided not to provide any allowance for additional breaks and/or time off task in the RFC **because** the ALJ believed the symptoms existed prior to his alleged onset date and because Plaintiff

16

was not taking his prescribed Flomax (R. 19).

In any event, the evidence available, as set forth above, supports that Plaintiff was suffering from chronic urinary frequency problems from February 2021 through October 2021, when he began taking Flomax, and then again when he stopped taking the medication. As noted by the Commissioner, the ALJ claimed significant improvement by Plaintiff in April 2021. However, the medical record shows that while Plaintiff noted some improvement he still suffered from "significant urgency." (R. 311.) There is nothing in this record suggesting that no limitations were necessary during the period, especially given the record of chronic urinary problems and that the next medical note regarding this issue, dated October 12, 2021, stated that Plaintiff was urinating every 60 to 90 minutes and "does continue to suffer from increased urinary frequency and urgency." (R. 449.)

The Commissioner also argues that while the VE testified that there would be no jobs available for an individual who had to "take a break every hour and a half throughout the eight-hour day" (R. 66-67), Plaintiff's attorney did not ask the VE about bathroom breaks, which would likely to be of shorter duration than a "break" as typically defined under SSR 96-9p, and that Plaintiff testified that he could go without urinating up to every two hours in an eight-hour work day (Dkt. 19 at 8, 10). The Court rejects this argument. First, the ALJ did not assert this as a basis for denying benefits and the Court may not accept or manufacture post hoc rationales for the ALJ's decisions. *See Ronald V. v. Kijakazi*, No. 22-CV-2140 (TNL), 2023 WL 6318276, at *6 (D. Minn. Sept. 28, 2023) ("[T]he ALJ's decision cannot be sustained on the basis of the post-hoc

17

rationalizations of appellate counsel.") (collecting cases). Indeed, the ALJ only stated in her opinion that she did "not ma[k]e any allowance for additional breaks"; she did not set forth what the standard allowances were for any kind of breaks and how they accommodated any limitations. In addition, this argument misstates Plaintiff's testimony, which was clarified by his counsel that he could only go up to an hour and a half before needing to use a bathroom. Notably, the ALJ acknowledged Plaintiff's testimony that "ongoing urinary urgency about every one to one and a half hours" (R. 17) and did not rely on Plaintiff's earlier testimony that "it's an hour – anywhere from an hour and a half to two hours at the most" (R. 62).

Moreover, SSR 96-9p does not govern the medium position assigned to Plaintiff by the ALJ in the RFC. It pertains to breaks for sedentary work and provides that customary breaks during a workday include: "a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." *See* SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996). Even if SSR 96-9p applies to the medium positions identified for Plaintiff at step five, the ruling only provides for three breaks during an 8-hour working day at 2-hour intervals. Assuming that Plaintiff could tolerate a bathroom break every two hours, SSR 96-9p would not account for the last three hours of the workday. It is important to note that a VE may testify that an employer would tolerate a typical bathroom break every two hours, but the VE was never asked this as part of a hypothetical. *See*, *e.g.*, *Nicole S. v. Kijakazi*, No. 2:22-cv-06655-HDV (ADS), 2023 WL 9107289, at *1 (C.D. Cal. Dec. 28, 2023) (adopting VE testimony that employers would tolerate a worker being off task, including for bathroom breaks, for "six minutes an hour"

18

or twelve minutes in a "two-hour block").

In sum, the Court remands this case for further proceedings. Specifically, on remand, the ALJ may inquire of a VE whether an employer would tolerate a bathroom break every two hours to the extent that it is the position of the ALJ that Plaintiff can tolerate urinating every two hours (or any other period(s) supported by the record) as part of the RFC. *See Binder v. Colvin*, No. 5:12-CV-271-D, 2013 WL 1686306, at *3 (E.D.N.C. Mar. 21, 2013) ("When an ALJ finds that a claimant has an impairment that requires him to have access to a bathroom, the ALJ should make specific findings concerning the frequency and duration of Plaintiff's bathroom usage. Because the ALJ did not do so here, the undersigned cannot determine whether the ALJ's findings—particularly his step five finding—were supported by substantial evidence.") (cleaned up), *R. & R. adopted*, 2013 WL 1694678 (E.D.N.C. Apr. 18, 2013).

## V.  ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Dkt. 17) is **GRANTED** in part;

2. Defendant Commissioner of Social Security Administration, Martin J. O'Malley's opposition (Dkt. 19) is **DENIED**; and

3. This case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with the Court's Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: July 2, 2024                                      *s/Elizabeth Cowan Wright*
                                                           ELIZABETH COWAN WRIGHT
                                                           United States Magistrate Judge